# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KAYLA L. BARNETT, | ) | CASE NO. 3:20-cv-00550 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Kayla L. Barnett, ("Plaintiff" or "Barnett"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her

applications for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act,

42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set

forth below, the Magistrate Judge recommends the Commissioner's final decision be VACATED

and the case REMANDED for further proceedings consistent with this decision.

---

[1]       On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

## I.    PROCEDURAL HISTORY

On November 19, 2016, Barnett filed an application for SSI, alleging a disability onset date of August 31, 2016 and claiming she was disabled due to a serious car crash that fractured her spine. (Transcript ("Tr.") at 16.)  The applications were denied initially and upon reconsideration, and Barnett requested a hearing before an administrative law judge ("ALJ").  (Tr. 16.)

On June 12, 2018, an ALJ held a hearing, during which Barnett, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 31-61.)  On  December 5, 2018, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id*. at 16-26.)  The ALJ's decision became final on January 21, 2020, when the Appeals Council declined further review.  (*Id*. at 1-3.)

On March 12, 2020, Barnett filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16, 17). Barnett asserts the following assignments of error:

> (1)    There is no substantial evidence to justify the ALJ's determination that Barnett did not meet or equal Listing 1.04 on disorders of the spine. In fact, the ALJ utterly failed to engage in any substantive discussion of the elements in the Listing and whether Barnett met them. Instead, the ALJ merely made a conclusory statement that Barnett did not meet the Listing without referencing any evidence in the record.

> (2)    The ALJ discounted objective medical evidence that Barnett has to use a hand-held walker to walk. The ALJ mischaracterized the evidence of Barnett's condition to make it seem that Barnett can walk with a cane, thereby not needing a walker.  In so doing, the ALJ did not accurately state the evidence of Barnett's residual functional capacity and in turn, whether Barnett meets a listed impairment. This collectively constitutes a lack of substantial evidence to justify the ALJ's determination that Barnett can perform sedentary work and does not meet a listed impairment.

> (3)    Barnett meets or equals Listing 1.04. In particular, she meets 1.04(C), which includes the inability to ambulate effectively under 1.00(B)(2)(b). In more

2

ways than one, Barnett satisfies the criteria in 1.00(B)(2)(b). She cannot sustain a reasonable walking pace over a sufficient distance. Her lower extremity functioning is insufficient enough that she needs a hand-held walker to walk, which then limits her upper extremity function. She cannot drive or travel without assistance to and from a place of employment or school.

(4)  If Barnett somehow does not meet Listing 1.04, there is still no substantial evidence that Barnett can perform sedentary work. The ALJ only made this finding by discounting objective medical evidence and mischaracterizing evidence of Barnett's condition. In fact, the substantial evidence, particularly a comprehensive functional capacity assessment by a physical therapist under the direction of a medical doctor, shows that Barnett cannot perform sedentary work.

(Doc. No. 14 at 1-2.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Barnett was born in 1991 and was 25 years old on the date the application was filed, making her a "younger individual age 18-44" at all relevant times.  (Tr. 25.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has at least a high school education and is able to communicate in English.  (*Id.*)  She has no past relevant work.  (*Id.*)

### B.  Relevant Medical Evidence[2]

Prior to August 31, 2016, Barnett had suffered from Type 1 diabetes and required an insulin pump. (Tr. 286.) On August 31, 2016, she passed out while driving and her car drove into a ditch. (*Id*. at 625.)  She was transported to Fisher-Titus Medical Center ("FTMC") in an ambulance, reported pain in her lower back and pelvic area, and stated she could not move her legs, and they felt

---

[2]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  No mental impairments were found in this case, and therefore the recitation of evidence focuses solely on Barnett's physical impairments.

numb.  (*Id*. at 625-6.)  On examination, she was able to feel light tough on her legs, but had a sensory decrease,  and had some tenderness to palpation as well as a numbness and tingling feeling in her legs.   (*Id*. at 627.)  She was able to move her feet from side to side, but not flex them or wiggle her toes.  (*Id*.)  A radiologist's report documented a burst fracture of the T2 vertebrae with spinal canal stenosis, and Barnett was transferred to University of Toledo Medical Center ("UTMC") via life flight.   (*Id*. at 631.)

On September 1, 2016 an MRI of Barnett's thoracic spine showed a "burst fracture" of a thoracic vertebra, with fragments causing "severe narrowing of the central canal" and spinal cord swelling, and mild right neural foraminal narrowing at T12-L1.  (*Id*. at 376.)  On examination, UTMC examining physician Dr. Kevin Nguyen noted that Barnett had mildly decreased (4/5) strength and diminished deep tendon reflexes in her lower extremities. (*Id*. at 292.)  On the same day, UTMC surgeon Dr. Azedine Medhkour performed thoracolumbar surgery on Barnett including a bilateral laminectomy of T12, bilateral partial laminectomy of L1, corpectomy of T12, diskectomy of T11-L1, and fusion between T10 to L2. (*Id*. at 266.)  Following surgery, she could not wiggle her toes, but could flex her knees.  (*Id*. at 267.)

On September 6, 2016, postsurgical x-rays showed "[n]o hardware complications or significant changes in alignment." (*Id*. at 378.)

On September 8, 2016, Barnett was discharged to Firelands Acute Rehabilitation, as she continued to need catheterization which she could not manage herself while wearing the TLSO brace.  (*Id*. at 267.)

On September 19, 2016, Barnett saw Dr. Medhkour at the UTMC surgery clinic for a follow-up examination.  (*Id*. at 430.)  She reported that she could walk 40 steps with a walker and

was improving with physical therapy. (*Id*. at 432.)  Dr. Medhkour noted that she had mildly reduced

strength in her hips and knees (4/5), improved knee extension and flexion, greatly reduced strength

in her ankles and feet (1/5, 3/5), and  she still had no sensation below the ankles.  (*Id*. at 432-33.)

On September 28, 2016, Barnett was discharged from the Rehabilitation Center.  (*Id*. at419.)

On October 3, 2016, Barnett began to physical therapy at FTMC with Jessica Kurtz, PT.  (*Id*.

at 753.)  She reported that her "overall orthopedic condition" was "improving."  (*Id*.)  She scored

58% on the Revised Oswestry Disability Index, indicating "severe disability."[3]

Also on October 3, 2016, Barnett returned to the UTMC surgery clinic and saw Joseph J.

Lach, M.D. (*Id*. at 424.). She reported she had improved motor strength and sensation, and was "only

unable to move [her] toes."  (*Id*. at 428.)  Dr. Lach observed that Barnett ambulated with a walker,

and wore ankle splints and a back brace.  (*Id*. at 429.)  Dr. Lach referred her to the pain management

clinic. (*Id*.)  Barnett went to the pain management clinic the same day, and saw Joseph Atallah, M.D.

(*Id*. at 420.)  Dr. Attallah observed that Barnett could "ambulate with assistance" and that she "uses

[a] wheelchair to ambulate." (*Id*. at 423.) She had decreased (3/5) strength in her lower extremities.

(*Id*.)

On October 20, 2016, Barnett returned to the surgery clinic, using a wheelchair.  (*Id*. at 415.)

Elise B. Gray, MSN, rated Barnett as having greatly reduced (2/5) or no (0/5) strength in her lower

extremities.  (*Id*. at 419.)  Barnett reported that she could walk with a walker.  (*Id*. at 419.)  X-rays

of her thoracolumbar spine showed "[u]nchanged alignment" and "[n]o evidence of complications"

---

[3]      The Revised Oswestry Disability Index is a questionnaire developed to measure a
patient's permanent functional disability. A score between 41% and 60%
indicates "severe disability."  Fairbank JC, Pynsent PB. The Oswestry Disability
Index. *Spine* 2000 Nov 15; 25(22):2940-52; discussion 52.

(Tr. 380).  At the pain management clinic on the same day, Dr. Atallah observed that Barnett's strength in her lower extremities was mildly reduced (4/5).  (*Id*. at 415.)

On October 21, 2016, Barnett went to FTMC, reporting issues with her catheter.  (*Id*. at 652.) She said that she was currently rehabbing in a wheelchair.  (*Id*. at 652.)

On November 1, 2016, PT Kurtz, noted that Barnett had "dramatically improved her gait distances and her transfer skills." (*Id*. at 761.)

On November 29, 2016, Barnett sought treatment for a possible urinary tract infection at the FTMC  Emergency Department.  (*Id*. at 667.)  Jansen Musselman, PA-C, reported that Barnett arrived by "[p]rivate vehicle, walking."  (*Id*. at 667.)  PA Musselman observed that Barnett had a normal range of motion in her back, no gross musculoskeletal deformity, and no evidence of focal neurological deficits.  (*Id*. at 669.) She was diagnosed with a UTI and discharged with medication. (*Id*. at 670.)

On December 5, 2016, Barnett returned to the FTMC Emergency Department reporting nausea, vomiting, and a headache.  (*Id*. at  674.) She was diagnosed with hyperglycemia, a UTI, and diabetes, and discharged with medication (Tr. 680).

On December 19, 2016, Barnett returned to see Dr. Medhkour at the UTMC surgery clinic, using a walker.  (*Id*. at 261.)  Aside from weakness in dorsiflexion of her feet and in her "Great Toe[s]," Barnett had normal strength in her legs.  (*Id*. at 264.)  A CT scan showed normal spinal alignment and normal paraspinous soft tissues.  (*Id*.)  Dr. Medhkour described her spinal canal as "preserved," and  Dr. Medhkour advised her to continue physical therapy and undergo a CT scan in June.  (*Id*.)

Also on December 19, 2016, Barnett returned to the FTMC Emergency Department,

reporting dental pain and vomiting.  (*Id*. at 685.)  Ronobir Mallic, D.O., observed that she had normal range of motion, normal strength, and normal motor function.  (*Id*. at 689.)  She was discharged two days later, and Nurse Charlene Breedlove noted that Barnett used a walker for ambulation and had bilateral foot weakness and "noted foot drop."  (*Id*. at 695-96.)

On December 27, 2016, PT Kurtz noted that Barnett had improved lower extremity control, hip strength, and knee strength, though she had "no active movement or trace at ankles."  (*Id*. at 764.)

On January 21, 2017, Barnett returned to the FTMC Emergency Department with a headache and nasal congenstion.  (*Id*. at 719.) Michael Kirschmann, PA-C, observed that she arrived by "[p]rivate vehicle, walking" (*Id*.)  He noted that she had normal range of motion, normal strength, and "normal motor" findings.  (*Id*. at 722.)

On January 24, 2017, PT Kurtz noted that Barnett's lower extremity strength and control continued to improve.  (*Id*. at 768.)

On March 21, 2017, PT Kurtz noted Barnett was making "excellent progress" and Barnett reported that she had made "gains in her ability to stand for ADL at home" and was "pleased with her progress with forearm crutches." (*Id*. at 786.)

On April 10, 2017, Barnett returned to the FTMC Emergency Department, reporting abdominal pain and vomiting.  (*Id*. at 860.) She reported being in physical therapy and ambulating only with a walker.  (*Id*. at 860- 61). She was wearing ankle-foot orthotics for her bilateral foot drop. (*Id*. at 861, 864.) She was discharged the next day (Tr. 859-60).

On April 11, 2017, PT Kurtz did an impatient examination of Barnett after she was admitted to FTMC for UTI/cystitis, abdominal pain, and vomiting.  (*Id*. at 883.)  She  noted Barnett had

recently resumed cosmetology school and used a front-wheeled walker for ambulating and forearm crutches in physical therapy.  (*Id*.)

On May 27, 2017, Barnett returned to the FTMC Emergency Department, reporting abdominal pain and vomiting.  (*Id*. at 891.)  Robert A. Hill, PA-C, observed that she had normal range of motion, normal strength, and "normal motor" findings.  (*Id*. at 895).  After receiving fluids and antiemetics, she was discharged.  (*Id*. at 899-900.)

On June 5, 2017, Melinda DePolo, PT, performed a "FTMC Functional Capacity Report." (*Id*. at 791.)  Dr. John K. Hughes wrote a letter accompanying the assessment in which he opined that Barnett was disabled and invited the recipient to contact his office with any questions.  (*Id*. at 790.)  PT DePolo noted that Barnett had poor balance, and was unable to perform the lift, push-pull, or carry tests due to her heavily reliance on her front-wheeled walker for mobility. (*Id*. at 793.) Barnett reported attending cosmetology school, and having difficulty standing for the required 1-2 hour intervals throughout the 7.5 hour school day.  (*Id*. at 795.)  She opined that Barnett avoid numerous activities.[4] (*Id*. at 809-10.)  She opined that potential barriers to Barnett's return to work included her inability to stand for very long, difficulty walking, poor balance, decreased ability to carry things, and decreased ability to lift things depending on weight.  (*Id*. at 798.)

On July 13, 2017, Barnett returned to the FTMC Emergency Department reporting that she lost her balance "while she was walking to the bathroom," fell on her bottom, and had been suffering back pain since.  (*Id*. at 912.)  A CT of Barnett's thoracic spine showed "an old severe compression fracture of the T12 vertebrae," which had been treated with surgery, "mild retropulsion of the

---

[4]     This part of the record is partially unreadable, and therefore the specific activities could not be discerned.

vertebra" and "no malalignment."  (*Id*. at  910.) Dane F. Parsons, D.O., observed that Barnett had "normal motor" findings and "normal coordination."  (*Id*. at 916.)  Dr. Parsons diagnosed her with a strain, and Barnett was discharged (Tr. 920).

On August 8, 2017, Barnett returned to the FTMC Emergency Department  reporting low blood sugar.  (*Id*. at 926.) Erin Kurtz, D.O., described Barnett as "paralyzed from the waist down. She does have some movement of her legs but is non-ambulatory.  Sensation intact." (*Id*. at 926). Dr. Kurtz observed that Barnett had "minimal movement" of her lower extremities, which she described as her "baseline." (*Id*. at 929). Barnett was diagnosed with hypoglycemia and discharged (*Id*. at 932.)

On November 7, 2017, Barnett returned to the FTMC Emergency Department, reporting vomiting and abdominal pain.  (*Id*. at 957-58.)  Astrih H. Hajdari, M.D., observed that she had normal range of motion, normal strength, normal sensation, and "normal motor" findings.  (*Id*. at 959.)

On November 29, 2017, Barnett returned to FTMC, reporting nasal congestion and sinus pressure.  (*Id*. at 966.)  Tim Thomas, M.D., noted that she had bilateral leg weakness and could "walk using her walker." (*Id*. at 966, 969.)  Barnett also reported pain in her back at the surgical site had been an "ongoing frequent discomfort for her."  (*Id*. at 966.)  She was diagnosed with sinusitis, a UTI, and low back pain, and discharged.  (*Id*. at 970).

On December 8, 2017, Barnett saw FTMC pain management specialist Joshua Goldner, M.D. for treatment of her low back pain. (*Id*. at 978.) He noted "partial paralysis in the lower extremities" and Barnett rated her low back pain as "8/10" since the accident in August 2016.  (*Id*.) Barnett described her pain as "aching" and stated that she "managed with Percocet and Hydrocodone for a

while and now goes to the Emergency Room intermittently with back pain to get pain pills." (*Id*.) Dr. Goldner observed that her lower extremities had diffuse weakness and foot drop, and that she ambulated with an "antalgic gait" and a walker. (*Id*. at 979.) Dr. Goldner opined that her pain "seems mechanical in nature . . . . likely due to facet joint strain and myofascial pain." (*Id*. at 979). Dr. Goldner also stated that Barnett "repeatedly asked about Percocet or Hydrocodone for her pain," but he explained that her age and reported pain did not make her a "good opioid candidate," and instead recommended anti-inflammatory medication, and facet blocks. (*Id*. at 979-80.) She again declined any injections. (*Id*. at 980.)

On December 13, 2017, Barnett returned to the FTMC Emergency Department, reporting pain in her back, elbow, and legs. (*Id*. at 983.) Dr. Thomas observed that Plaintiff had braces on her lower extremities, but normal range of motion, normal sensation, and "normal motor" findings. (*Id*. at 987.) He also observed that she had no tenderness while distracted. (*Id*.)

On January 3, 2018, Barnett returned to Dr. Goldner for another pain management consultation, rating her pain as "10/10" and describing it as "sharp and aching." (*Id*. at 1009.) On examination, he observed "no acute distress," an "antalgic gait," "tender" paraspinal muscles, and bilateral facet loading. (*Id*.) Dr. Goldner again explained that he could not recommend opioid medication, and recommended facet block injections or acupuncture, which Barnett refused, and chiropractic care, which she was "interested in." (*Id*. at 1010.) X-rays of her lumbar spine showed no significant change since earlier CT scans. (*Id*. at 1011.)

On January 24, 2018, Barnett returned to physical therapy to treat her "difficulty walking." (*Id*. at 1028-9.) She reported being "very sore and achy and . . . unable to get out of bed some days," using her frontwheeled walker when it is "cold and snowy" and otherwise using crutches to walk.

(*Id*. at 1028.)  Jill Burkholder, PT, noted Barnett had deficits in ambulation, balance, coordination, range of motion, strength, posture and endurance, as well as "pain limiting function." (*Id*. at 1029.)

On March 20, 2018, Barnett had completed 9 land and 7 pool visits for physical therapy.  (*Id*. at 1037.)  PT Burkholder noted that Barnett was "showing improvement with her gait and is using a [large-base quad cane] at home and in public. (*Id*. at 1039.)  PT Burkholder observed that Plaintiff could walk 100 feet with the cane and supervision. (*Id*.)

On April 17, 2018, PT Burkholder observed that Barnett used the large-base quad cane independently. (*Id*. at 1043.). She also observed that Barnett was now independent with a small-base quad cane at home. (*Id*. at 1043.) She was discharged from physical therapy, and advised to continue her home exercise program independently, and get a pool pass for aquatic exercise.  (*Id*.)

On May 25, 2018, Jean Felck, CNP, at the Firelands Diabetes Center for Advanced Care opined that Barnett "will need to use a walker to be able to get around."  (*Id*. at 1061.)

## C.    State Agency Reports

On January 24, 2017, state agency reviewing physician Lynne Torello, M.D., opined that Barnett had the following limitations to her residual functional capacity ("RFC"):

- occasionally lift and/or carry twenty pounds;

- frequently lift and/or carry ten pounds;

- stand or walk with normal breaks about six hours in an eight-hour work day;

- sit with normal breaks about six hours in an eight-hour work day;

- occasionally climb ramps and stairs, and/or stoop;

- never climb ladders, ropes or scaffolds, and/or crawl; and

- avoid all exposure to hazards including machinery and heights.

11

(*Id*. at 66-8.)  On April 19, 2017, state agency reviewing physicians David Knierim, M.D., concurred with Dr. Torello's opinion.  (*Id*. at 77-8.)

**D.**    **Hearing Testimony**

During the June 12, 2018 hearing, Barnett testified to the following:

- She is a resident of Norwalk, Ohio.  (Tr. 35.)

- She is 5'1" tall and weights 100 pounds.  (*Id*.)

- She lives alone in a mobile home.  (*Id*. at 35-6.)

- Prior to her injury, she was on disability for about 3 years due to complications from uncontrolled diabetes.  (*Id*. at 36.)

- She has a valid driver's license, but is not able to drive due to lack of "complete feeling" in her feet and legs.  She needs permission from her spinal surgeon to begin driving again.  She does not know when she will be permitted to drive.  (*Id*. at 36-7.)

- Her mother and aunt drove her to the hearing.  (*Id*. at 37.)

- She completed twelfth grade, and can read, write, make change in a store and operate a checking account.  (*Id*.)

- Her disability is the result of a car accident.  She was driving to work when her blood sugar dropped.  After the accident and an "incomplete spinal cord surgery," she needed to use a walker and didn't have the feeling in her feet and legs, so she "wasn't able to do anything, really."  (*Id*. at 38.)

- Since the accident, she hasn't applied for jobs or unemployment benefits.  (*Id*.)

- What prevents her from working is the lack of full feeling in her feet and legs, difficulty in standing or sitting very long, and the need to use her walker to keep her balance.  (*Id*. at 38-9.)

- At home, she spends most of her time on the couch with icepacks on her back, and takes Ibuprofen or Tramadol to "get [her] back to relax."  The braces she wears on her legs make them swell, so she has to lie on the couch to reduce the swelling before she can walk.  (*Id*. at 38-9.)

- Her legs and back hurt a lot, and the pain keeps her up at night.  There is shooting pain in her lower back a little past her shoulder blades.  (*Id*. at 39.)

12

- She regularly sees a "diabetic doctor," an endocrinologist, a spinal surgeon and a "foot doctor." (*Id*.)

- She wears a pump to monitor her blood sugars. (*Id*. at 40.)

- She has no mental health issues and does not smoke, or use drugs or alcohol. (*Id*. at 41.)

- She can walk for "maybe about ten minutes" before needing to sit down. She gets tired out after walking "like ten steps." (*Id*.)

- She uses a walker that was prescribed after her spinal surgery all the time, even at home. Her doctor is aware she relies on the walker. (*Id*. at 41-2.)

- She has a cane, but does not usually use it because her balance is off. (*Id*. at 42.)

- On a typical day, she fixes herself food. Standing for five or ten minutes causes her legs to swell and she has to sit down and prop up her legs. She usually uses ice packs and Ibuprofen to help with her pain. She lays on the couch and watches tv. She "can't really lift anything or bend or twist." (*Id*. at 42-3.)

- She can't sit for long periods because if she does her legs "just ... start slipping," and she experiences back pain. (*Id*. at 43.)

- She was in a wheelchair for about six to eight months after her accident. She is not ready to try using a quad cane because her balance is off, and she has had some falls. (*Id*. at 44.)

- Her last fall was in December or January, when she "slipped right underneath the walker." She went to the Emergency Room . (*Id*.)

- Her left side is weaker than her right side.  Sometimes her fingers go numb. (*Id*. at 45.)

- She cannot sleep at night because of her back pain. On an average night, she sleeps about four or five hours. A couple of nights a week she gets no sleep. She sometimes falls asleep during the day, while watching tv. (*Id*. at 46-7.)

- Her family lives close by and helps her by doing her laundry, putting her dishes away, carrying her groceries, and sweeping the floor. (*Id*. at 47.)

- Cold weather bothers her. (*Id*. at 48.)

- The trip to the hearing took about an hour in the car.  She needed to stop "at least three times" because her back felt like she was 'laying on cardboard," and she needed to stretch  (*Id*.)

- The chairs in the lobby outside the hearing room also felt like she was "in that cardboard," causing pain to go right through her back.  (*Id*. at 49.)

- She worked part time at McDonald's in 2015, and she has never had a full time job.  (*Id*. at 50.)

- It would hurt a little bit to reach in front of her, and she sometimes drops things because her hands go numb.  (*Id*. at 51-2.)

The ALJ found Barnett had no past relevant work.  (Tr.  53.)  The ALJ then posed the following hypothetical question:

> Please assume a hypothetical individual of the Claimant's age, education and relevant vocational background, she's able to do light work except she can occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds and can occasionally balance, stoop, kneel, crouch, but never crawl.  In addition, she can never work at unprotected heights or around moving dangerous, mechanical parts.  She can never operate a motor vehicle.  She can occasionally work in conditions of humidity and wetness and extreme heat or cold or in conditions where there are vibrations.  She is limited to two extra bathroom breaks per day that are no more than five minutes each and she is limited to a sit/stand option at the workstation each hour to change position for two minutes while remaining on task 90% of the time.

(Tr. 53-4.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy such as electrical accessories assembler, industrial bagger, and hand packager.  (*Id*. at 54.)

Next, the ALJ amended the hypothetical to add the limitations that the hypothetical individual required an assistive device to ambulate to the workstation, such as a cane or walker, and is limited to frequent handling or fingering.  (*Id*. at 55.)  The VE explained that the three examples of representative jobs in the economy would not be compromised.  (*Id*.)

14

The ALJ again amended the hypothetical to add additional limitations that the hypothetical individual was restricted to sedentary work.  (*Id*. at 55-6.)  The VE testified the hypothetical individual would be able to perform representative jobs in the economy such as call-out operator, document preparer, and information clerk.  (*Id*. at 56.)

The ALJ asked some questions across all exertional levels.  (*Id*. at 57.)  In response, the VE testified that lying down during the workday, outside of normally scheduled breaks; missing two or more days of work on an ongoing basis; or being off-task more than 25% of the workday would each be work preclusive.  (*Id*.)

Barnett explained that she is sometimes incontinent, and that when she has an accident, it "takes a lot of time" for her to change.  (*Id*. at 59.)

## III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must qualify as "disabled" under the regulations, and also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) & 416.920(c).  A "severe impairment" is one that "significantly limits . . .

physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *&* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *&* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since November 19, 2016, the application date.

2.    The claimant has the following severe impairments: status post spine fracture with spinal cord lesion; degenerative disc disease, lumbar spine with stenosis; and status post spinal surgery of the lumbar and thoracic spine.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except she can occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, and can occasionally balance, stoop, kneel, crouch, but never crawl.  In addition, she can never work at unprotected heights, or around moving dangerous mechanical parts, and she can never operate a motor vehicle.  She can occasionally work in conditions of humidity and wetness, in extreme heat or cold, and in conditions where there are vibrations.  She is limited to two extra bathroom breaks per day that are no

16

more than 5 minutes each, and she is limited to a sit-stand position at the workstation each hour to change position for two minutes, while remaining on task 90% of the time.  She is limited to an assistive device to ambulate to the workstation such as a cane or walker and she is limited to frequent handling and fingering.

5.     The claimant has no past relevant work.

6.     The claimant was born May **, 1991 and was 25 years old, which is defined as a younger individual age 18-44, on the date the application was filed.

7.     The claimant has at least a high school education and is able to communicate in English.

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.    The claimant has not been under a disability, as defined in the Social Security Act, since November 19, 2016, the date the application was filed.

(Tr. 18-26) (internal citations omitted.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th

17

Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.      First Assignment of Error: Listing 1.04

Barnett contends that the ALJ erred by failing to engage in a "substantive analysis of the record" when reaching her determination that Barnett did not meet or equal a listed impairment. (Doc. No. 14 at 9.) She asserts that, had the ALJ made such an analysis, she "would have inevitably had to conclude that Barnett met Listing 1.04 and therefore was disabled." (*Id*.) She argues that the ALJ also erred by failing to identify substantial evidence in the record to support the finding that Barnett did not meet the listing. (*Id*. at 10.)

The Commissioner responds that substantial evidence supports the ALJ's finding that that Barnett's impairments did not meet Listing 1.04. (Doc. No. 16 at 11.) He notes that the ALJ specifically considered Listing 1.04, and determined that Barnett did not meet the listing's criteria. (*Id*. at 12.) He argues that the discussion of relevant evidence in the subsequent portions of the decision provides a comprehensive analysis of the ALJ's reasoning. (*Id*.)

19

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425 at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings

20

for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *Id.* at 416-17.  *See also Harvey v. Comm'r of Soc. Sec.*, No. 16 3266, 2017 WL 4216585 at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review'") (quoting *Reynolds*, 424 F. App'x at 416); *Joseph v. Comm'r of Soc. Sec.*, No. 17-4158, 2018 WL 3414141 at *4 (6th Cir. July 13, 2018) (same).  *See also Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227 at *10 (N.D. Ohio Nov. 26, 2014) ("Although it is the claimant's burden of proof at Step 3, the ALJ must provide articulation of his Step 3 findings that will permit meaningful review. . . This court has stated that 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'") (quoting *Woodall v. Colvin*, 2013 WL 4710516 at *10 (N.D. Ohio Aug.29, 2013)).

Here, Barnett argues the ALJ erred in finding she did not meet the requirements of Listing 1.04(c).  That Listing defines a disorder of the spine as follows:

> Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively.[5]

---

[5] Listing 1.00(B)(1)(b)(1) defines an inability to ambulate effectively as meaning: an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (internal citation omitted).

20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04(C)

> At step three, the ALJ's analysis was brief:

> The claimant's impairments have been evaluated in the context of the listings, including but not limited to Listings 1.02 an 1.04, to determine whether the claimant's impairments, singularly or in combination, meet or medically equal one of the listed impairments.  The claimant also has a diagnosis of diabetes, which the undersigned had considered under SSR 14-2p, which instructs adjudicators on the analysis of diabetes mellitus.  It is concluded that the claimant does not manifest clinical signs or findings that meet the specific criteria of any of the listings.

(Tr. 19.)

Although the ALJ's discussion of Listings 1.02 and 1.04 at step three is brief, and uses boilerplate language, the ALJ provided a detailed discussion at step four of Barnett's orthopedic complaints and the treatment history of her back.  (Tr. 21-25.)  This discussion supported her step three conclusion and her brief analysis at step three is permissible if the more robust step four analysis enables this Court to conduct a meaningful review of the decision.  *Goddard v. Berryhill*, No. 1:16CV1389, 2017 WL 2190661, *17 (N.D. Ohio May 1, 2017), *report and recommendation adopted,* 2017 WL 2155391 (N.D. Ohio May 17, 2017) ("although the ALJ's. . . discussion at Step Three is brief, the ALJ made sufficient factual findings elsewhere in her decision to support her Step Three conclusion and to enable the Court to meaningfully review her decision."); *Kern v. Comm'r of Soc. Sec.,* No. 2:16-cv-57, 2017 WL 1324609, *2 (S.D. Ohio Apr. 11, 2017) ("The Commissioner's decision may be upheld where the ALJ made sufficient factual findings elsewhere in his decision to support the conclusion at step three.").

There are two elements of Listing 1.04 that are disputed in this case: whether Barnett had spinal stenosis lasting at least twelve months, and whether she was unable to ambulate effectively for at least twelve months.  Each is discussed in turn below.

22

### 1. Spinal Stenosis

Barnett argues that, while the spinal fracture was repaired with surgery to prevent further damage to the spinal cord, the damage and compromise already done to the spinal cord is permanent. (Doc. No. 17 at 2.) She points to medical record evidence documenting that she still required use of a walker at all times in July 2018 as evidence that her spinal cord remained compromised. (*Id*. at 1.)

The Commissioner disputes Barnett's assertion that she had "compromise of a nerve root or spinal cord lasting at least 12 months." (Doc. No. 16 at 14.) He concedes that her spinal cord was fractured in the August 2016 auto accident, but asserts that, after surgery, this impairment was corrected. He points to medical reports of imaging taken in July 2017, which was discussed in the ALJ's decision, showing "mild retropulsion of the vertebra" and "no malalignment," as evidence this condition did not last 12 months. (*Id*.)

In her decision, the ALJ discussed multiple images of Barnett's spinal column. First, she discussed the CT scan showing a burst fracture at the T12 vertebrae with a fragment displaced into the spinal canal, and a thoracic MRI confirming this diagnosis and also showing retropulsed segments causing severe canal narrowing, cord edema from T11-L1, and a dorsal hematoma at T11-T12, both taken immediately following her August 2016 auto accident. (Tr. 21.) She noted that, following Barnett's spinal surgery, "x-rays taken October 19, 2016, showed no changes and no complications." (*Id*.) She noted that a 3-D CT scan of Barnett's spine taken in December 2016 "showed no evidence of complication, further fracture, or change in alignment." (*Id*. at 22.) She also noted that CT imaging taken in July 2017 "showed no evidence of acute fracture." (*Id*.)

The July 2017 CT imaging cited by the Commissioner showed "[n]arrowing of the T9-T10 disc" and "[n]arrowing at T12-L1 disc." (Tr. 910.)  Lumbar x-rays taken in January 2018 showed "no significant change" from previous CT scans, suggesting the narrowing remained. (*Id*. at 1011.) Neither party cites a medical determination of whether this narrowing is significant enough to comprise lumbar spinal stenosis.[6]  The ALJ's failure to directly address this matter anywhere in her decision leaves the Court unable to conduct a meaningful review of this element of the decision,[7] however it is a harmless error unless the other elements of the Listing are met.  Neither party disputes that Barnett suffered chronic nonradicular pain and weakness throughout the relevant period.  Therefore, this analysis turns to the last element of the listing: whether Barnett's spinal injury resulted in inability to ambulate effectively.

**2.    Effective Ambulation**

The crux of the parties' disagreement over whether Barnett meets Listing 1.04 is the issue of whether she can "ambulate effectively."  Listing 1.00(B)(1)(b)(1) defines an inability to ambulate

---

[6]    The National Institute of Arthritis and Musculoskeletal and Skin Diseases defines "Spinal Stenosis" as occurring "when the spaces in the spine narrow and create pressure on the spinal cord and nerve roots." https://www.niams.nih.gov/health-topics/spinal-stenosis (Last visited 11/30/20).

[7]    The Commissioner asserts that "Plaintiff's spinal disorder did not cause ongoing compression of a nerve root or the spinal cord, [so] it cannot meet the strict requirements of Listing 1.04." (Doc. No. 16 at 13-14.)  However, this conclusion is nowhere in the ALJ's decision.  As courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration."  *See, e.g., Blackburn*, 2013 WL 3967282 at *8; *Cashin v. Colvin*, No. 1:12 CV 909, 2013 WL 3791439 at *6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, No. 1:10  CV  02936, 2012 WL 253320 at *5 (N.D. Ohio Jan. 26, 2012).

24

effectively as meaning "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."  Therefore, if Barnett requires the use of a walker or forearm crutches, she cannot "ambulate effectively" as defined in the requirements of Listing 1.04.  If she is able to walk with a large-based quad cane, she can ambulate effectively, and does not meet an essential requirement of the listing.[8]

The ALJ explained her determination that Barnett could ambulate with a large-based quad cane as follows:

> At the time of the automobile accident, the claimant was enrolled in cosmetology school, and had to temporarily discontinue that schooling.  However, in April 2017 she reported recently resuming her education . . . . [D]espite testifying at the hearing that she had no training in cosmetology, the claimant reported in January 2018 that she recently graduated from that program.  Further, the record show that, during that schooling, the claimant was able to attend the program 7.5 hours per day, and further during that time was able to stand with her front-wheeled walker in front of her to style a client's hair.  The record further demonstrates that although the claimant testified at the hearing to always needing to use the front-wheeled walker, even at home, the record shows that in March, 2018 she reported being able to use the quad cane at home and in public.  She reported that she used the front-wheeled walker if she needed to get up during the night as she does not have her AFOs on during that time.  She also reported being independent with showering.  The claimant reported to the therapist during the functional capacity evaluation that she was able to do her household chores, with the exception of sweeping and mopping, and that she could do her dishes and put food away, although she needed help with carrying the groceries.

(Tr. 24-5) (internal citations omitted).

---

[8]     Barnett also makes an argument that she meets the listing because she cannot drive or transport herself whatsoever to and from a place of employment or school.  (Doc. No. 14 at 12.)  Because she cites no evidence is support of this assertion, it is deemed waived and not addressed herein.

Barnett points out that only one medical finding is cited in support of this determination: the March 2018 report of her treating physical therapist stating Barnett was "showing improvement with her gait and is using a [large-base quad cane] at home and in public. (*Id*. at 1039.)  She points to numerous other records documenting Barnett's need for a walker.  (Doc. No. 17 at 2.)  However, the single record cited by the ALJ is not the only one showing Barnett ambulating with a quad cane. For example, on April 17, 2018, the same physical therapist observed that Barnett used the large-base quad cane independently, and was now independent with a small-base quad cane at home. (*Id*. at 1043.)  ALJ reasonably relied on both the physical therapy notes and Barnett's activities of daily living to determine her residual functional capacity as of the date of her decision.

The medical records show that Barnett's ability to ambulate was not static during the period at issue here.  Barnett claims disability from the date of her auto accident, August 31, 2016 .  The ALJ does not cite any evidence showing that Barnett was able to use a quad cane prior to March, 2018, more than twelve months after the alleged onset date.  The ALJ notes that, in June 2017, Barnett reported attending cosmetology school, and having difficulty standing for the required 1-2 hour intervals throughout the 7.5 hour school day.  (*Id*. at 795.)  However, both medical records and Barnett's testimony consistently show that she relied on a walker or forearm crutches to ambulate during this period, which is not inconsistent with the ability to attend classes, and none of the records show that she was standing for long periods unassisted.  For example, in April 11, 2017, an inpatient physical therapy assessment noted that Barnett used a front-wheeled walker for ambulating and forearm crutches in physical therapy.  (*Id*. at 883.)  Further, the ALJ's decision acknowledged that, at the time Barnett returned to school, she "used a front-wheeled walker for ambulation and had forearm crutches that she used in physical therapy."  (*Id*. at 22.)  FTMC Emergency Department

notes from August 2017 described Barnett as "paralyzed from the waist down. She does have some movement of her legs but is non-ambulatory. Sensation intact." (*Id*. at 926). FTMC Emergency Department notes from November 2017 describe her as "able to walk using her walker." (*Id*. at 966.) In January 2018, she began the course of physical therapy which included that March and April 2018 notes. (*Id*. at 1027.) At that time, the physical therapist documented that she was able to walk 150 feet with the assistance of her front-wheeled walker. (*Id.* at 1030.) The ALJ's decision notes that she "reported still using her crutches to walk, but that when it was cold and snowy she uses her front wheeled walker." (*Id*. at 23.) Her primary diagnosis for physical therapy was "difficulty walking," and her prognosis was "fair" due to the "[s]everity of impairment." (*Id*. at 1032.)

As the Commissioner points out, Barnett failed to point to specific documentation demonstrating that her walker was medically necessary. (Doc. No. 16 at 16.) However, this, again, is an impermissible *post hoc* rationale. Further, a petitioner's obligation to provide proof of her disability is balanced by the ALJ's obligation to provide substantial evidence for her decision. In this case, the ALJ noted numerous pieces of medical evidence documenting Barnett's need for a walker or forearm crutches, and failed to provide any evidentiary basis for her conclusion that Barnett was able to ambulate effectively during the period prior to March 2018.

It is not clear from the decision whether the ALJ based her finding regarding Listing 1.04 on a finding that Barnett did not have spinal stenosis, a finding that she could ambulate effectively, or both. This fails to meet the ALJ's obligation to clearly explain her decision, and build a logical bridge between the facts of the case and her determination, and prevents the Court from providing a meaningful review of that decision. Therefore, the Court finds the ALJ failed to set forth good reasons for determining that Barnett did not meet or medically equal the requirements of Listing 1.04

prior to March 2018.  Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to provide an explanation for her conclusion that Barnett did not have a disability which met or medically equaled Listing 1.04 during the period prior to March 2018.

**B.** **Second Assignment of Error: Whether Substantial Evidence Supports the ALJ's Findings**

Next, Barnett makes a closely-related claim that there is no substantial evidence that Barnett can perform sedentary work. (Doc. No. 14 at 2.) She asserts that "[t]he ALJ only made this finding by discounting objective medical evidence and mischaracterizing evidence of Barnett's condition. In fact, the substantial evidence, particularly a comprehensive functional capacity assessment by a physical therapist under the direction of a medical doctor, shows that Barnett cannot perform sedentary work.."

The Commissioner argues that the ALJ reasonably gave greater weight to the objective factual statement of Barnett's treating physical therapist that she was "using [a] [large-base quad cane] at home and in public," than she did to the later, subjective opinion about Barnett's functional capacity provided by a different physical therapist.  (Doc. No. 16 at 18, citing Tr. 1039.)  He notes that the ALJ gave the opinion evidence that Barnett asserts was discounted "partial weight," based on its inconsistency with other medical evidence, and did limit Barnett to sedentary work with additional limitations.  (*Id*. at 19.)

The portion of the ALJ's decision at issue here is the same one discussed *supra*.  First, Barnett cites the June 5, 2017, opinion of PT Melinda DePolo, PT, who performed an examination documented in a "FTMC Functional Capacity Report."  (*Id*. at 791.)  PT DePolo noted that Barnett had poor balance, and was unable to perform the lift, push-pull, or carry tests due to her heavily reliance on her front-wheeled walker for mobility. (*Id*. at 793.) She argues that this opinion should

28

have been given greater weight than the March 20, 2018, physical therapy progress note stating Barnett was "showing improvement with her gait and using [a large-base quad cane] at home and in public at this time." (*Id*. at 1039.)

These two notes are separated by eight months. Given the nature of Barnett's impairment, there is no inherent contradiction in their differing findings. Barnett argues that the ALJ improperly relied on the opinions of the state agency reviewing physicians instead of relying on the opinion by a physical therapist who examined her under the supervision of a physician. The ALJ weighed the state agency reviewers' opinions alongside the inconsistent opinions of two physical therapists, all given at different points in Barnett's recovery. Each of the physical therapy records may have accurately documented Barnett's condition at the moment in time when they were made. The state agency reviewers' opinions reflect only those records which they had access to at the time they rendered their opinions.

The ALJ weighed the totality of the evidence, as she is required to do, and gave substantial evidence for her finding that Barnett was capable of sedentary work after March 2018. However, as discussed *supra,* the ALJ's Decision does not provide a similarly substantial evidentiary basis for finding that Barnett was capable of sedentary work prior to that date. The physical therapy treatment note cited by Barnett in support of a more restrictive finding of disability was made eight months prior to March 2018. Therefore, remanding this case for an explanation of the ALJ's determination that Barnett was not disabled prior to March 2018 will also afford the ALJ the opportunity to more clearly explain her treatment of PT DePolo's June 5, 2017 opinion. The undersigned recommends that the ALJ take the opportunity of remand to clarify her treatment of PT DePolo's opinion, by

29

considering it in the context of contemporaneous evidence.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further proceedings consistent with this decision.


s/Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 7, 2020


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**